In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-3701 & 08-3712

CHAPMAN KELLEY,

*Plaintiff-Appellant/*
*Cross-Appellee,*

*v.*

CHICAGO PARK DISTRICT,

*Defendant-Appellee/*
*Cross-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:04-cv-07715—**David H. Coar**, *Judge.*

ARGUED SEPTEMBER 10, 2009—DECIDED FEBRUARY 15, 2011

Before MANION, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* Chapman Kelley is a nationally recognized artist known for his representational paintings of landscapes and flowers—in particular, romantic floral and woodland interpretations set within ellipses. In 1984 he received permission from the

Chicago Park District to install an ambitious wildflower display at the north end of Grant Park, a prominent public space in the heart of downtown Chicago. "Wildflower Works" was thereafter planted: two enormous elliptical flower beds, each nearly as big as a football field, featuring a variety of native wildflowers and edged with borders of gravel and steel.

Promoted as "living art," Wildflower Works received critical and popular acclaim, and for a while Kelley and a group of volunteers tended the vast garden, pruning and replanting as needed. But by 2004 Wildflower Works had deteriorated, and the City's goals for Grant Park had changed. So the Park District dramatically modified the garden, substantially reducing its size, reconfiguring the oval flower beds into rectangles, and changing some of the planting material.

Kelley sued the Park District for violating his "right of integrity" under the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A, and also for breach of contract. The contract claim is insubstantial; the main event here is the VARA claim, which is novel and tests the boundaries of copyright law. Congress enacted this statute to comply with the nation's obligations under the Berne Convention for the Protection of Literary and Artistic Works. VARA amended the Copyright Act, importing a limited version of the civil-law concept of the "moral rights of the artist" into our intellectual-property law. In brief, for certain types of visual art—paintings, drawings, prints, sculptures, and exhibition photographs—VARA confers upon the artist certain

rights of attribution and integrity. The latter include the right of the artist to prevent, during his lifetime, any distortion or modification of his work that would be "prejudicial to his . . . honor or reputation," and to recover for any such intentional distortion or modification undertaken without his consent. *See* 17 U.S.C. § 106A(a)(3)(A).

The district court held a bench trial and entered a split judgment. The court rejected Kelley's moral-rights claim for two reasons. First, the judge held that although Wildflower Works could be classified as both a painting and a sculpture and therefore a work of visual art under VARA, it lacked sufficient originality to be eligible for copyright, a foundational requirement in the statute. Second, following the First Circuit's decision in *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir. 2006), the court concluded that site-specific art like Wildflower Works is categorically excluded from protection under VARA. The court then held for Kelley on the contract claim, but found his evidence of damages uncertain and entered a nominal award of $1. Both sides appealed.

We affirm in part and reverse in part. There is reason to doubt several of the district court's conclusions: that Wildflower Works is a painting or sculpture; that it flunks the test for originality; and that *all* site-specific art is excluded from VARA. But the court was right to reject this claim; for reasons relating to copyright's requirements of expressive authorship and fixation, a living garden like Wildflower Works is not copyrightable. The district court's treatment of the contract

claim is another matter; the Park District is entitled to judgment on that claim as well.

## I. Background

Kelley is a painter noted for his use of bold, elliptical outlines to surround scenes of landscapes and flowers. In the late-1970s and 1980s, he moved from the canvas to the soil and created a series of large outdoor wildflower displays that resembled his paintings. He planted the first in 1976 alongside a runway at the Dallas-Fort Worth International Airport and the second in 1982 outside the Dallas Museum of Natural History. The wildflower exhibit at the museum was temporary; the one at the airport just "gradually petered out."

In 1983 Kelley accepted an invitation from Chicago-based oil executive John Swearingen and his wife, Bonnie—collectors of Kelley's paintings—to come to Chicago to explore the possibility of creating a large outdoor wildflower display in the area. He scouted sites by land and by air and eventually settled on Grant Park, the city's showcase public space running along Lake Michigan in the center of downtown Chicago. This location suited Kelley's artistic, environmental, and educational mission; it also provided the best opportunity to reach a large audience. Kelley met with the Park District superintendent to present his proposal, and on June 19, 1984, the Park District Board of Commissioners granted him a permit to install a "permanent Wild Flower Floral Display" on a grassy area on top of the underground Monroe Street parking garage in Daley

Bicentennial Plaza in Grant Park. Under the terms of the permit, Kelley was to install and maintain the exhibit at his own expense. The Park District reserved the right to terminate the installation by giving Kelley "a 90 day notice to remove the planting."

Kelley named the project "Chicago Wildflower Works I." The Park District issued a press release announcing that "a new form of 'living' art" was coming to Grant Park— "giant ovals of multicolored wildflowers" created by Kelley, a painter and "pioneer in the use of natural materials" who "attracted national prominence for his efforts to incorporate the landscape in artistic creation." The announcement explained that "[o]nce the ovals mature, the results will be two breathtaking natural canvases of Kelley-designed color patterns."

In the late summer of 1984, Kelley began installing the two large-scale elliptical flower beds at the Grant Park site; they spanned 1.5 acres of parkland and were set within gravel and steel borders. A gravel walkway bisected one of the ovals, and each flower bed also accommodated several large, preexisting air vents that were flush with the planting surface, providing ventilation to the parking garage below. For planting material Kelley selected between 48 and 60 species of self-sustaining wildflowers native to the region. The species were selected for various aesthetic, environmental, and cultural reasons, but also to increase the likelihood that the garden could withstand Chicago's harsh winters and survive with minimal maintenance. Kelley designed the initial placement of the wildflowers so they would

blossom sequentially, changing colors throughout the growing season and increasing in brightness towards the center of each ellipse. He purchased the initial planting material—between 200,000 and 300,000 wild-flower plugs—at a cost of between $80,000 and $152,000. In September of 1984, a battery of volunteers planted the seedlings under Kelley's direction.

When the wildflowers bloomed the following year, Wildflower Works was greeted with widespread acclaim. Chicago's mayor, the Illinois Senate, and the Illinois Chapter of the American Society of Landscape Artists issued commendations. People flocked to see the lovely display—marketed by the Park District as "living land-scape art"—and admiring articles appeared in national newspapers. Wildflower Works was a hit. Here's a picture:



For the next several years, Kelley's permit was renewed and he and his volunteers tended the impressive garden. They pruned and weeded and regularly planted new seeds, both to experiment with the garden's composition and to fill in where initial specimen had not flourished. Of course, the forces of nature—the varying bloom periods of the plants; their spread habits, compatibility, and life cycles; and the weather—produced constant change. Some wildflowers naturally did better than others. Some spread aggressively and encroached on neighboring plants. Some withered and died. Unwanted plants sprung up from seeds brought in by birds and the wind. Insects, rabbits, and weeds settled in, eventually taking a toll. Four years after Wildflower Works was planted, the Park District decided to discontinue the exhibit. On June 3, 1988, the District gave Kelley a 90-day notice of termination.

Kelley responded by suing the Park District in federal court, claiming the termination of his permit violated the First Amendment. The parties quickly settled; in exchange for dismissal of the suit, the Park District agreed to extend Kelley's permit for another year. On September 14, 1988, the Park District issued a "Temporary Permit" to Kelley and Chicago Wildflower Works, Inc., a nonprofit organization formed by his volunteers. This permit authorized them "to operate and maintain a two ellipse Wildflowers Garden Display . . . at Daley Bicentennial Plaza in Grant Park" until September 1, 1989. The permit stipulated that Kelley "will have responsibility and control over matters relating to the aesthetic design and content of Wildflower Works I," and Wildflower

Works, Inc. "shall maintain the Wildflower Works I at no cost to the Chicago Park District including, without limitation, weeding and application of fertilizer." Although it did not contain a notice-of-termination provision, the permit did state that "[t]he planting material is the property of Mr. Chapman Kelley" and that Kelley "may remove the planting material" if the permit was not extended. Finally, the permit provided that "[t]his agreement does not create any proprietary interest for Chicago Wildflower Works, Inc., or Mr. Chapman Kelley in continuing to operate and maintain the Wildflower Garden Display after September 1, 1989."

The Park District formally extended this permit each succeeding year through 1994. After that point Kelley and his volunteers continued to cultivate Wildflower Works without a permit, and the Park District took no action, adverse or otherwise, regarding the garden's future. In March 2004 Kelley and Jonathan Dedmon, president of Wildflower Works, Inc., attended a luncheon to discuss the 20th anniversary of Wildflower Works. At the luncheon Dedmon asked Park District Commissioner Margaret Burroughs if Wildflower Works needed a new permit. Commissioner Burroughs responded, "You're still there, aren't you? That's all you need to do."

Three months later, on June 10, 2004, Park District officials met with Kelley and Dedmon to discuss problems relating to inadequate maintenance of the garden and forthcoming changes to Grant Park necessitated by the construction of the adjacent Millennium Park. The officials proposed reconfiguring Wildflower

Works—decreasing its size from approximately 66,000 square feet to just under 30,000 square feet and remaking its elliptical flower beds into rectangles. The District's director of development invited Kelley's views on this proposal but made it clear that the District planned to go forward with the reconfiguration with or without Kelley's approval. Kelley objected to the proposed changes, but did not request an opportunity to remove his planting material before the reconfiguration took place. A week later the Park District proceeded with its plan and reduced Wildflower Works to less than half its original size. The elliptical borders became rectilinear, weeds were removed, surviving wildflowers were replanted in the smaller-scale garden, and some new planting material was added. Dedmon sent a letter of protest to the Park District.

Kelley then sued the Park District for violating his moral rights under VARA. He claimed that Wildflower Works was both a painting and a sculpture and therefore a "work of visual art" under VARA, and that the Park District's reconfiguration of it was an intentional "distortion, mutilation, or other modification" of his work and was "prejudicial to his . . . honor or reputation." *See* 17 U.S.C. § 106A(a)(3)(A). He also alleged breach of contract; he claimed that Commissioner Burroughs's remark created an implied contract that the Park District had breached when it altered Wildflower Works without

providing reasonable notice.[1] On the VARA claim Kelley sought compensation for the moral-rights violation, statutory damages, and attorney's fees; on the contract claim he sought the fair-market value of the planting material removed in the reconfiguration. He later quantified his damages, estimating the value of the plants at $1.5 million and requesting a staggering $25 million for the VARA violation.

The case proceeded to a bench trial, and the district court entered judgment for the Park District on the VARA claim and for Kelley on the contract claim. *See Kelley v. Chi. Park Dist.*, No. 04 C 07715, 2008 WL 4449886 (N.D. Ill. Sept. 29, 2008). The judge first concluded that Wildflower Works could be classified as both a painting and a sculpture and therefore qualified as a work of visual art under VARA. *Id.* at *4-5. But he also held that Wildflower Works was insufficiently original for copyright, a prerequisite to moral-rights protection under VARA. *Id.* at *6. Alternatively, the judge concluded that Wildflower Works was site-specific art, and following the First Circuit's decision in *Phillips*, held that VARA did not apply to this category of art. *Id.* at *6-7. On the contract claim the court construed the Chicago Park District Act, 70 ILL. COMP. STAT. 1505/7.01, to permit individual commissioners to enter into binding contracts

---

[1] The complaint also alleged that the Park District's actions constituted an unlawful taking, but the district court dismissed this count prior to trial. The takings claim is not at issue on appeal.

on the Park District's behalf. *Id.* at *7-8. The judge found that Commissioner Burroughs's statement— "You're still there, aren't you? That's all you need to do."—created an implied contract that the Park District had breached by failing to give Kelley reasonable notice before altering Wildflower Works. *Id.* But the judge also concluded that Kelley had failed to prove damages to a reasonable certainty and awarded $1 in nominal damages. *Id.* at *9.

Kelley appealed, challenging the adverse judgment on the VARA claim and the district court's treatment of the damages issue on the contract claim. The Park District cross-appealed from the judgment on the contract claim.

## II. Discussion

This case comes to us from a judgment entered after a bench trial; we review the district court's factual findings for clear error and its conclusions of law de novo. *Spurgin-Dienst v. United States*, 359 F.3d 451, 453 (7th Cir. 2004). In this circuit, questions of copyright eligibility are issues of law subject to independent review. *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 517 (7th Cir. 2009).

### A. Kelley's Moral-Rights Claim Under the Visual Artists Rights Act of 1990

#### 1. A brief history of moral rights

That artists have certain "moral rights" in their work is a doctrine long recognized in civil-law countries but only recently imported into the United States. Moral

rights are generally grouped into two categories: rights of attribution and rights of integrity. "Rights of attribution" generally include the artist's right to be recognized as the author of his work, to publish anonymously and pseudonymously, to prevent attribution of his name to works he did not create, and to prevent his work from being attributed to other artists. *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995) (citing RALPH E. LERNER & JUDITH BRESLER, ART LAW 419-20 (1989)). "Rights of integrity" include the artist's right to prevent the modification, mutilation, or distortion of his work, and in some cases (if the work is of recognized stature), to prevent its destruction. *Id.* at 81-82 (citing ART LAW at 420-21).

Originating in nineteenth-century France, moral rights— *le droit moral*[2]—are understood as rights inhering in the artist's personality, transcending property and contract rights and existing independently of the artist's economic interest in his work. *See 3* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8D.01[A] (2010); 5 WILLIAM F. PATRY, PATRY ON COPYRIGHT §§ 16:1, 16:3 (2010); John Henry Merryman, *The Refrigerator of Bernard Buffet*, 27 HASTINGS L.J. 1023, 1023-28 (1976). American copyright law, on the other hand, protects the economic interests of artists; Article I of the Constitution

---

[2] The use of the French singular "connotes an indivisible package of rights, as distinguished from the plural 'moral rights,' reflective of the current American concept of divisibility." 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8D.01[A] n.4 (2010).

authorizes Congress "To Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. 1, § 8, cl. 8. Unlike other intellectual-property rights, moral rights are unrelated to the artist's pecuniary interests and are grounded in philosophical ideas about the intrinsic nature and cultural value of art rather than natural-property or utility justifications.[3] *See Carter*, 71 F.3d at 81 (describing moral rights as "rights of a spiritual, non-economic and personal nature [that] . . . spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved"). VARA introduced a limited version of this European doctrine into American law, but it is not an easy fit.[4]

---

[3] For different views on the theoretical foundations of moral-rights doctrine, see Charles Cronin, *Dead on the Vine: Living and Conceptual Art and VARA*, 12 VAND. J. ENT. & TECH. L. 209, 215-18 (2010); Amy M. Adler, *Against Moral Rights*, 97 CALIF. L. REV. 263, 266-71 (2009); Roberta Rosenthal Kwall, *Inspiration and Innovation: The Intrinsic Dimension of the Artistic Soul*, 81 NOTRE DAME L. REV. 1945, 1976-83 (2006); Burton Ong, *Why Moral Rights Matter: Recognizing the Intrinsic Value of Integrity Rights*, 26 COLUM. J.L. & ARTS 297, 299-301 (2003); and J. H. Merryman, *The Public Interest in Cultural Property*, 77 CALIF. L. REV. 339 (1989).

[4] For economic and pragmatic analysis of moral-rights doctrine, see William M. Landes & Richard A. Posner, *The Economic*

(continued...)

VARA was enacted as a consequence of the United States' accession to the Berne Convention for the Protection of Literary and Artistic Works. After many years of resistance, the Senate ratified the treaty in 1988, bringing the United States into the Berne Union effective the following year. *See* 4 NIMMER § 17.01[C][2] (2010); 5 PATRY §§ 16:1, 16:3. The Berne Convention dates to 1886, when seven European nations (plus Haiti and Tunisia) joined together to extend copyright protection across their borders. *See* 4 NIMMER § 17.01[B][1] nn.10 & 17 (2002). During the course of the next century, many other nations joined, and the treaty underwent periodic revisions, most notably for our purposes in 1928 when Article *6bis* was added, incorporating the concept of moral rights. *See* 3 *id.* § 8D.01[B] (2004); 5 PATRY §§ 16:1, 16:3. Article *6bis* provides:

> (1) Independently of the author's economic rights, and even after the transfer of the said rights, the author shall have the right to claim authorship of the work and to object to any distortion, mutilation or other modification of, or other derogatory action in relation to, the said work, which would be prejudicial to his honor or reputation.

---

[4] (...continued)
*Structure of Intellectual Property Law*, Ch. 10, "Moral Rights and the Visual Artists Rights Act," 270-93 (2003); Henry Hansmann & Marina Santilli, *Authors' and Artists' Moral Rights: A Comparative Legal and Economic Analysis*, 26 J. LEGAL STUD. 95 (1997); and Thomas F. Cotter, *Pragmatism, Economics, and the Droit Moral*, 76 N.C. L. REV. 1 (1997).

. . . .

> (3) The means of redress for safeguarding the rights granted by this Article shall be governed by the legislation of the country where protection is claimed.

Berne Convention for the Protection of Literary and Artistic Works, art. *6bis*, Sept. 9, 1886, *as revised at* Paris on July 24, 1971, S. TREATY DOC. NO. 99-27 (1986).

When the United States joined the Berne Union in 1989, the concept of moral rights was largely unknown in American law. *See Lee v. A.R.T. Co.*, 125 F.3d 580, 582 (7th Cir. 1997) ("[I]t was accepted wisdom [before VARA] that the United States did not enforce any claim of moral rights."); *see also Weinstein v. Univ. of Ill.*, 811 F.2d 1091, 1095 n.3 (7th Cir. 1987) (The Continental principle of *le droit moral* is a doctrine that "no American jurisdiction follows as a general matter."); Merryman, *The Refrigerator of Bernard Buffet*, 27 HASTINGS L.J. at 1035-36 ("The moral right of the artist, and in particular that component called the right of integrity of the work of art, simply does not exist in our law."). Article *6bis* was a major obstacle to Berne ratification. *See Martin v. City of Indianapolis*, 192 F.3d 608, 611 (7th Cir. 1999) (The treaty's moral-rights concept "was controversial in this country" and was embraced post-Berne only "in a very limited way."); *Carter*, 71 F.3d at 82-83 ("The issue of federal protection of moral rights was a prominent hurdle in the debate over whether the United States should join the Berne Convention . . . ."); *see also* 3 NIMMER § 8D.02[A]-[D] (2004); 5 PATRY §§ 16:1, 16:3;

Roberta Rosenthal Kwall, *How Fine Art Fares Post VARA*, 1 MARQ. INTELL. PROP. L. REV. 1, 1-4 (1997).

American unease with European moral-rights doctrine—more particularly, the obligations imposed by Article *6bis*—persisted beyond Berne ratification. Indeed, Congress initially took the position that domestic law already captured the concept in existing copyright and common-law doctrines and in the statutory law of some states. *See* Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, §§ 2(2), (3), 102 Stat. 2853; 3 NIMMER § 8D.02[D][1] (2009); 5 PATRY § 16:3. This was seen as an implausible claim. *See* 3 NIMMER § 8D.02[D][1] ("Th[e] Congressional finding flies in the face of numerous judicial and scholarly pronouncements . . . ."); 5 PATRY § 16:3 (The American position that existing federal and state laws satisfied minimum Berne obligations created "a web of fictional compliance."). "[A] question of international credibility existed," and "some Berne co-Unionists . . . expressed doubts regarding the accuracy or sincerity of the U.S. declaration that its law already afforded a degree of moral rights protection equivalent to Berne standards." Jane C. Ginsburg, *Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990*, 14 COLUM.-VLA J.L. & ARTS 477, 478-79 (1990). VARA was enacted to fill this perceived gap, but its moral-rights protection is quite a bit narrower than its European counterpart.

### 2. *VARA's scope*

VARA amended the Copyright Act and provides a measure of protection for a limited set of moral rights falling under the rubric of "rights of attribution" and "rights of integrity"—but only for artists who create specific types of visual art. 17 U.S.C. § 106A(a). The statutory coverage is limited to paintings, drawings, prints, sculptures, and photographs created for exhibition existing in a single copy or a limited edition of 200 or less. *See id.* § 101 (defining "work of visual art"). The rights conferred by the statute exist independently of property rights; the artist retains them even after he no longer holds title to his work. *Id.* § 106A(a).

More specifically, VARA's attribution and integrity rights are as follows:

> **(a) Rights of attribution and integrity.** Subject to section 107 and independent of the exclusive rights provided in section 106, *the author of a work of visual art—*
>
> **(1)** shall have the right—
>
>> **(A)** to claim authorship of that work, and
>>
>> **(B)** to prevent the use of his or her name as the author of any work of visual art which he or she did not create;
>
> **(2)** shall have the right to prevent the use of his or her name as the author of the work of visual art in the event of distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and

**(3)** subject to the limitations set forth in section 113(d), *shall have the right—*

> **(A)** *to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right,* and

> **(B)** to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. § 106A(a) (emphasis added). At issue here is the right of integrity conferred by subsection (a)(3)(A), which precludes any intentional modification or distortion of a work of visual art that "would be prejudicial to [the artist's] honor or reputation."

A qualifying "work of visual art" is defined as:

> **(1)** *a painting*, drawing, print, *or sculpture*, existing in a single copy, in a limited edition of 200 or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or

> **(2)** a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200

copies or fewer that are signed and consecutively number by the author.

*Id.* § 101 (emphasis added). This definition also contains a number of specific exclusions: e.g., posters, maps, and globes; books, newspapers, magazines, and other periodicals; "motion picture[s] or other audiovisual work[s]"; merchandising and promotional materials; "any work made for hire"; and "any work not subject to copyright protection under this title." *Id.*

This last exclusion simply reinforces the point that VARA supplements general copyright protection; to qualify for moral rights under VARA, a work must first satisfy basic copyright standards. Under the Copyright Act of 1976, copyright subsists in "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated." *Id.* § 102(a). "Works of authorship" include "pictorial, graphic, and sculptural works." *Id.* § 102(a)(5). VARA's definition of "work of visual art" is limited to a narrow subset of this broader universe of "pictorial, graphic, and sculptural works" that are otherwise eligible for copyright; only a select few categories of art get the extra protection provided by the moral-rights concept. 5 PATRY § 16:7 (2010) ("Protected 'works of visual art' is a narrower subcategory of 'pictorial, graphic, and sculptural works,' protected in section 102(a)(5).").

Several exceptions limit the scope of the rights granted under the statute:

**(c) Exceptions. (1)** The modification of a work of visual art which is a result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A).

**(2)** *The modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement,* of the work *is not a destruction, distortion, mutilation, or other modification* described in subsection (a)(3) *unless the modification is caused by gross negligence.*

17 U.S.C. § 106A(c) (emphasis added). The second of these—the "public presentation" exception—is at issue here. Another exception invoked by the Park District is found in a different section of the Copyright Act that defines the scope of a copyright owner's rights:

**(d)(1)** *In a case in which—*

**(A)** *a work of visual art has been incorporated in or made part of a building* in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3), and

**(B)** the author consented to the installation of the work in the building either before the effective date set forth in section 610(a) of the Visual Artists Rights Act of 1990, or in a written instrument executed on or after such effective date that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruction, distor-

tion, mutilation, or other modification, by reason of its removal,

*then the rights conferred by paragraphs (2) and (3) of section 106A(a) shall not apply.*

*Id.* § 113 (emphasis added). This is known as the "building exception."

VARA rights cannot be transferred or assigned, but they can be waived in a writing signed by the artist and "specifically identify[ing] the work, and uses of that work, to which the waiver applies." *Id.* § 106A(e)(1). Absent a written waiver, the artist retains VARA rights during his lifetime even if he transfers ownership of the work or assigns his copyright.[5] *Id.* § 106A(d)(1), (e)(2).

### 3.  Is Wildflower Works a painting or sculpture?

The district court held that Wildflower Works was both a painting and a sculpture but was insufficiently original to qualify for copyright. Alternatively, the

---

[5]  VARA applies to works created after its effective date (June 1, 1991, six months after its December 1, 1990 date of enactment) and works created before its effective date "but title to which has not, as of such effective date, been transferred from the author." Visual Artists Rights Act of 1990, Pub. L. No. 101-650, § 610, 104 Stat. 5132. Wildflower Works was created before VARA's effective date, but the parties stipulated that Kelley owns the planting material. Kelley has not executed a written waiver of VARA rights.

court concluded that it was site-specific art and held that all site-specific art is implicitly excluded from VARA. Other arguments—in particular, whether Wildflower Works satisfies additional threshold requirements for copyright and whether VARA's public-presentation or building exceptions applied—were not reached.

On appeal Kelley contests the district court's conclusions regarding originality and site-specific art. The Park District defends these holdings and also reiterates the other arguments it made in the district court, except one: The Park District has not challenged the district court's conclusion that Wildflower Works is a painting and a sculpture.

This is an astonishing omission. VARA's definition of "work of visual art" operates to narrow and focus the statute's coverage; only a "painting, drawing, print, or sculpture," or an exhibition photograph will qualify. These terms are not further defined, but the overall structure of the statutory scheme clearly illuminates the limiting effect of this definition. Copyright's broad general coverage extends to "original works of authorship," and this includes "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). The use of the adjectives "pictorial" and "sculptural" suggests flexibility and breadth in application. In contrast VARA uses the specific nouns "painting" and "sculpture." To qualify for moral-rights protection under VARA, Wildflower Works cannot just be "pictorial" or "sculptural" in some aspect or effect, it must actually *be* a "painting" or a "sculpture." Not metaphorically or by analogy, but *really*.

That Kelley considered the garden to be both a painting and a sculpture—only rendered in living material—is not dispositive. He also characterized it as an experiment in environmental theory, telling a reporter he was trying to "figure out the economic and ecological impact of introducing wildflowers into cities." In promoting Wildflower Works, Kelley variously described the project as a "living wildflower painting," a "study on wildflower landscape and management," and "a new vegetative management system that beautifies [the] landscape economically with low-maintenance wildflowers."

Kelley's expert, a professor of art history, reinforced his view that Wildflower Works was both a painting and a sculpture, but the district court largely disregarded her testimony as unhelpful.[6] *Kelley*, 2008 WL 4449886, at *5. For its part the Park District initially marketed Wildflower Works as "living art," but this adds little to the analysis. VARA plainly uses the terms "painting" and "sculpture" as words of *limitation*. Even assuming a generous stance on what qualifies, *see* 5 PATRY § 16:7 (suggesting a "liberal attitude toward what may be considered a painting, drawing, print, or sculpture"), the terms cannot be read coextensively with the broader

---

[6] Among other things, the expert testified that Wildflower Works was both a painting and a sculpture because "three dimensional objects become two dimensional paintings when viewed from airplanes," an assertion the district court characterized as "strange." *Kelley v. Chi. Park Dist.*, No. 04 C 07715, 2008 WL 4449886, at *5 (N.D. Ill. Sept. 29, 2008).

categories of "pictorial" and "sculptural" works that are generally eligible for copyright under § 102(a)(5). If a living garden like Wildflower Works really counts as both a painting and a sculpture, then these terms do no limiting work at all.

The district judge worried about taking "too literalist an approach to determining whether a given object qualifies as a sculpture or painting." *Kelley*, 2008 WL 4449886, at *4. His concern was the "tension between the law and the evolution of ideas in modern or avant garde art; the former requires legislatures to taxonomize artistic creations, whereas the latter is occupied with expanding the definition of what we accept to be art." *Id.* We agree with this important insight. But there's a big difference between avoiding a literalistic approach and embracing one that is infinitely malleable. The judge appears to have come down too close to the latter extreme.[7]

---

[7] The district court basically concluded that the term "sculpture" included *any* three-dimensional art form—that is, any "non-two dimensional" work that can be called "art." *Kelley*, 2008 WL 4449886, at *5. As we have noted, this expansive approach fails to distinguish between "sculptural works," included in the broad subject matter of copyright, and VARA's use of the more limited term "sculpture." As for "painting," the judge consulted this *verb* definition for "paint": " '[1] to apply color, pigment, or paint to . . . [2] to produce in lines and colors on a surface by applying pigments, [3] to depict by such lines and colors, [4] to decorate, adorn, or variegate by applying lines and colors.' " *Id.* (quoting Merriam-Webster's Online

(continued...)

[7] (...continued)
Dictionary, http://www.m-w.com/dictionary/paint[1] (last visited September 25, 2008)). The judge then characterized Wildflower Works as "[a]n exhibit that corrals the variegation of wildflowers into pleasing oval swatches" and concluded from this that the garden "could certainly fit within some of the[se] . . . definitions of a painting." *Id.*

As we have explained, however, VARA's definition of a "work of visual art" uses *nouns*, not *verbs*. The noun "painting" is more precise than the verb "paint." A "painting" is:

> **1.a.** Painted matter; that which is painted; . . . a representation on a surface executed in paint or colours; a painted picture or likeness. **b.** The representing of a subject on a surface by the application of paint or colours; the art of making such representations; . . . the practice of applying paint to a canvas, etc., for any artistic purpose.

*Painting Definition*, OXFORD ENGLISH DICTIONARY, http://www.oed.com/viewdictionaryentry/Entry/136092 (last visited Feb. 10, 2011). The noun "sculpture" means:

> **1.a.** . . . the process or art of carving or engraving a hard material so as to produce designs or figures in relief, in intaglio, or in the round. In modern use, that branch of fine art which is concerned with the production of figures in the round or in relief, either by carving, by fashioning some plastic substance, or by making a mould for casting in metal; the practice of this art. . . . **2.** *concr.* **a.** The product of the sculptor's art; that which is sculptured (or engraved); sculptured figures in general. **b.** In particularized sense: A work of sculpture; a sculptured (or engraved) figure or design.

(continued...)

In short, this case raises serious questions about
the meaning and application of VARA's definition of
qualifying works of visual art—questions with poten-
tially decisive consequences for this and other moral-
rights claims. But the Park District has not challenged
this aspect of the district court's decision, so we move
directly to the question of copyrightability, which is
actually where the analysis should start in the first place.

### 4. Is *Wildflower Works* copyrightable?

To merit copyright protection, Wildflower Works must
be an "original work[] of authorship fixed in a[] tangible
medium of expression . . . from which [it] can be
perceived, reproduced, or otherwise communicated." 17
U.S.C. § 102(a). The district court held that although
Wildflower Works was both a painting and a sculpture,
it was ineligible for copyright because it lacked orig-
inality. There is a contradiction here. As we have ex-
plained, VARA supplements general copyright protec-
tion and applies only to artists who create the specific
subcategories of art enumerated in the statute. VARA-
eligible paintings and sculptures comprise a discrete
subset of otherwise copyrightable pictorial and sculptural

---

[7] (...continued)
*Sculpture Definition, id.*, http://www.oed.com/
viewdictionaryentry/Entry/173877 (last visited Feb. 10, 2011).
A living garden might be said to have "painterly" or "sculp-
tural" attributes, but it's hard to classify a garden as a "painting"
or "sculpture" as these terms are commonly understood.

works; the statute designates these works of fine art as worthy of special protection. If a work is so lacking in originality that it cannot satisfy the basic requirements for copyright, then it can hardly qualify as a painting or sculpture eligible for *extra* protection under VARA. *See* Cronin, *Dead on the Vine*, 12 VAND. J. ENT. & TECH. L. at 239 ("[I]f a work does not evince sufficient original expression to be copyrightable, the work should belong in a category other than 'visual art' as this term is contemplated under VARA.").

That point aside, the district court's conclusion misunderstands the originality requirement. Originality is "the touchstone of copyright protection today," an implicit constitutional and explicit statutory requirement. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347, 346 (1991) ("Originality is a constitutional requirement."); *id.* at 355 (The Copyright Act of 1976 made the originality requirement explicit.); *see also Schrock*, 586 F.3d at 518-19 ("As a constitutional and statutory matter, '[t]he *sine qua non* of copyright is originality.'" (quoting *Feist*, 499 U.S. at 345)). Despite its centrality in our copyright regime, the threshold for originality is minimal. *See Feist*, 499 U.S. at 345; *Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 979 (7th Cir. 1997) ("The necessary degree of 'originality' is low . . . ."). The standard requires "only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345 (citation omitted). The "requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade

quite easily, as they possess some creative spark." *Id.* (citation omitted).

The district court took the position that Wildflower Works was not original because Kelley was not "the first person to ever conceive of and express an arrangement of growing wildflowers in ellipse-shaped enclosed area[s]." *Kelley*, 2008 WL 4449886, at *6. This mistakenly equates originality with novelty; the law is clear that a work can be original even if it is not novel. *Feist*, 499 U.S. at 345 ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying."). No one argues that Wildflower Works was copied; it plainly possesses more than a little creative spark.

The judge was also at a loss to discover "what about the exhibit is original. Is it the elliptical design? The size? The use of native instead of non-native plants? The environmentally-sustainable gardening method to which 'vegetative management system' apparently refers?" *Kelley*, 2008 WL 4449886, at *6. It is true that common geometric shapes cannot be copyrighted. *See* U.S. COPYRIGHT OFFICE, COMPENDIUM II: COPYRIGHT OFFICE PRACTICES § 503.02(a)-(b) (1984); 2 PATRY § 4:17 (2010). And "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is de-scribed, explained, illustrated, or embodied in such a work." 17 U.S.C. § 102(b).

The Park District suggests that Wildflower Works is an uncopyrightable "method" or "system," and is also ineligible because its design uses simple elliptical shapes. The first of these arguments is not well-developed; the second is misplaced. Although Wildflower Works was designed to be largely self-sustaining (at least initially), it's not really a "method" or "system" at all. It's a garden. And Kelley is seeking statutory protection for the garden itself, not any supposed "system" of vegetative management encompassed within it. Regarding the use of elliptical shapes, an author's expressive combination or arrangement of otherwise noncopyrightable elements (like geometric shapes) may satisfy the originality requirement. *Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 939 (7th Cir. 1989); 2 PATRY § 4:17 (Geometric shapes or symbols cannot themselves be protected, but an original creative arrangement of them can be.).

The real impediment to copyright here is not that Wildflower Works fails the test for originality (understood as "not copied" and "possessing some creativity") but that a living garden lacks the kind of authorship and stable fixation normally required to support copyright. Unlike originality, authorship and fixation are *explicit* constitutional requirements; the Copyright Clause empowers Congress to secure for "authors" exclusive rights in their "writings." U.S. CONST. art 1, § 8, cl. 8; *see also* 2 PATRY § 3:20 (2010) ("[T]he Constitution uses the terms 'writings' and 'authors;' 'originality' is not used."); *id.* § 3:22 (2010); 1 NIMMER § 2.03[A]-[B] (2004). The originality requirement is implicit in these express limitations on the congressional copyright power. *See Feist*, 499 U.S. at

346 (The constitutional reference to "authors" and "writings" "presuppose[s] a degree of originality."). The Supreme Court has "repeatedly construed all three terms in relation to one another [or] perhaps has collapsed them into a single concept"; therefore, "[w]ritings are what authors create, but for one to be an author, the writing has to be original." 2 PATRY § 3:20.

"Without fixation," moreover, "there cannot be a 'writing.' " *Id.* § 3:22. The Nimmer treatise elaborates:

> Fixation in tangible form is not merely a statutory condition to copyright. It is also a constitutional necessity. That is, unless a work is reduced to tangible form it cannot be regarded as a "writing" within the meaning of the constitutional clause authorizing federal copyright legislation. Thus, certain works of conceptual art stand outside of copyright protection.

1 NIMMER § 2.03[B]. A work is "fixed" in a tangible medium of expression "when its embodiment in a copy or phonorecord . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17 U.S.C. § 101. As William Patry explains:

> Fixation serves two basic roles: (1) easing problems of proof of creation and infringement, and (2) providing the dividing line between state common law protection and protection under the federal Copyright Act, since works that are not fixed are ineligible for federal protection but may be protected under state law. The distinction between the intangible

> intellectual property (the work of authorship) and its fixation in a tangible medium of expression (the copy) is an old and fundamental and important one. The distinction may be understood by examples of multiple fixations of the same work: A musical composition may be embodied in sheet music, on an audio-tape, on a compact disc, on a computer hard drive or server, or as part of a motion picture soundtrack. In each of the fixations, the intangible property remains a musical composition.

2 PATRY § 3:22 (internal quotation marks omitted).

Finally, "authorship is an entirely human endeavor." *Id.* § 3:19 (2010). Authors of copyrightable works must be human; works owing their form to the forces of nature cannot be copyrighted. *Id.* § 3:19 n.1; *see also* U.S. COPYRIGHT OFFICE, COMPENDIUM II: COPYRIGHT OFFICE PRACTICES § 503.03(a) ("[A] work must be the product of human authorship" and not the forces of nature.) (1984); *id.* § 202.02(b).

Recognizing copyright in Wildflower Works presses too hard on these basic principles. We fully accept that the artistic community might classify Kelley's garden as a work of postmodern conceptual art. We acknowledge as well that copyright's prerequisites of authorship and fixation are broadly defined. But the law must have some limits; not all conceptual art may be copyrighted. In the ordinary copyright case, authorship and fixation are not contested; most works presented for copyright are unambiguously authored and unambiguously fixed. But this is not an ordinary case. A living garden like Wild-

flower Works is neither "authored" nor "fixed" in the senses required for copyright. *See Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005) ("A person's likeness—her persona—is not authored and it is not fixed."); *see also* Cronin, *Dead on the Vine*, 12 VAND. J. ENT. & TECH. L. at 227-39.

Simply put, gardens are planted and cultivated, not authored. A garden's constituent elements are alive and inherently changeable, not fixed. Most of what we see and experience in a garden—the colors, shapes, textures, and scents of the plants—originates in nature, not in the mind of the gardener. At any given moment in time, a garden owes most of its form and appearance to natural forces, though the gardener who plants and tends it obviously assists. All this is true of Wildflower Works, even though it was designed and planted by an artist.

Of course, a human "author"—whether an artist, a professional landscape designer, or an amateur backyard gardener—determines the initial arrangement of the plants in a garden. This is not the kind of authorship required for copyright. To the extent that seeds or seedlings can be considered a "medium of expression," they originate in nature, and natural forces—not the intellect of the gardener—determine their form, growth, and appearance. Moreover, a garden is simply too changeable to satisfy the primary purpose of fixation; its appearance is too inherently variable to supply a baseline for determining questions of copyright creation and infringement. If a garden can qualify as a "work of authorship" sufficiently "embodied in a

copy," at what point has fixation occurred? When the garden is newly planted? When its first blossoms appear? When it is in full bloom? How—and at what point in time—is a court to determine whether infringing copying has occurred?

In contrast, when a landscape designer conceives of a plan for a garden and puts it in writing—records it in text, diagrams, or drawings on paper or on a digital-storage device—we can say that his intangible intellectual property has been embodied in a fixed and tangible "copy." This writing is a sufficiently permanent and stable copy of the designer's intellectual expression and is vulnerable to infringing copying, giving rise to the designer's right to claim copyright. The same cannot be said of a garden, which is not a fixed copy of the gardener's intellectual property. Although the planting material is tangible and can be perceived for more than a transitory duration, it is not stable or permanent enough to be called "fixed." Seeds and plants in a garden are naturally in a state of perpetual change; they germinate, grow, bloom, become dormant, and eventually die. This life cycle moves gradually, over days, weeks, and season to season, but the real barrier to copyright here is not *temporal* but *essential.* The essence of a garden is its vitality, not its fixedness. It may endure from season to season, but its nature is one of dynamic change.

We are not suggesting that copyright attaches *only* to works that are static or fully permanent (no medium of expression lasts forever), or that artists who incorporate natural or living elements in their work can *never* claim copyright. Kelley compares Wildflower Works to the

Crown Fountain, a sculpture by Spanish artist Jaume Plensa that sits nearby in Chicago's Millenium Park. The surfaces of Plensa's fountain are embedded with LED screens that replay recorded video images of the faces of 1,000 Chicagoans. *See* http://www. explorechicago. org/city/en/things_see_do/attractions/dca_tourism/ Crown_ Fountain.html (last visited Feb. 10, 2011). But the Copyright Act specifically contemplates works that incorporate or consist of sounds or images that are broadcast or transmitted electronically, such as telecasts of sporting events or other live performances, video games, and the like. *See* 17 U.S.C. § 101 (defining "fixed" as including a "work consisting of sounds, images, or both, that are being transmitted . . . if a fixation of the work is being made simultaneously with its transmission"); *see also Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 675 (7th Cir. 1986); *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1013-14 (7th Cir. 1983). Wildflower Works does not fit in this category; the Crown Fountain is not analogous.

Though not addressing the requirement of fixation directly, the district court compared Wildflower Works to "[t]he mobiles of Alexander Calder" and "Jeff Koons' 'Puppy,' a 43-foot flowering topiary." *Kelley*, 2008 WL 4449886, at *4. These analogies are also inapt. Although the aesthetic effect of a Calder mobile is attributable in part to its subtle movement in response to air currents, *see* http://en.wikipedia.org/wiki/Alexander_Calder (last visited Feb. 10, 2011), the mobile itself is obviously fixed and stable. In "Puppy" the artist assembled a huge metal frame in the shape of a puppy and covered it with thou-

sands of blooming flowers sustained by an irrigation system within the frame. *See* http://en.wikipedia.org/ wiki/Jeff_Koons (last visited Feb. 10, 2011). This may be sufficient fixation for copyright (we venture no opinion on the question), but Wildflower Works is quite different. It is quintessentially a garden; "Puppy" is not.

In short, Wildflower Works presents serious problems of authorship and fixation that these and other examples of conceptual or kinetic art do not. Because Kelley's garden is neither "authored" nor "fixed" in the senses required for basic copyright, it cannot qualify for moral-rights protection under VARA.

## 5. Site-specific art, and the public-presentation and building exceptions

This case also raises some important questions about the application of VARA to site-specific art, as well as the statute's public-presentation and building exceptions. Though we need not decide these questions, we do have a few words of caution about the district court's treatment of the issue of VARA and site-specific art. The court classified Wildflower Works as a form of site-specific art; we see no reason to upset this factual finding. The court then adopted the First Circuit's holding in *Phillips* that site-specific art is categorically excluded from VARA. This legal conclusion is open to question.

*Phillips* involved a VARA claim brought by artist David Phillips in a dispute over a display of 27 of his sculptures in Boston's Eastport Park across from Boston Harbor.

*Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 130 (1st Cir. 2006). A planned redesign of the park called for the removal and relocation of Phillips's sculptures; he sought an injunction under VARA, claiming the removal of his sculptures would violate his right of integrity. *Id.* at 131. The district court held that although the sculptures qualified as a single integrated work of visual art, park administrators were entitled to remove them under VARA's public-presentation exception. *Id.* at 138-39. The First Circuit affirmed on alternative grounds, holding that VARA does not apply to *any* site-specific art.

The court based this holding on a perceived irreconcilable tension between the public-presentation exception and the purpose of site-specific art: "By definition, site-specific art integrates its location as one of its elements. Therefore, the removal of a site-specific work from its location necessarily destroys that work of art." *Id.* at 140. Under the public-presentation exception, a modification of a work of visual art stemming from a change in its "public presentation, including lighting or placement," is not actionable unless it is caused by gross negligence. If VARA applied to site-specific art, the First Circuit reasoned, then the statute would "purport[] to protect site-specific art" but also "permit its destruction by the application" of the public-presentation exception. *Id.* The court held that "VARA does not protect site-specific art and then permit its destruction by removal from its site pursuant to the statute's public presentation exception. VARA does not apply to site-specific art at all." *Id.* at 143.

There are a couple of reasons to question this interpretation of VARA. First, the term "site-specific art" appears nowhere in the statute. Nothing in the definition of a "work of visual art" either explicitly or by implication excludes this form of art from moral-rights protection. Nor does application of the public-presentation exception operate to eliminate *every* type of protection VARA grants to creators of site-specific art; the exception simply narrows the scope of the statute's protection for all qualifying works of visual art. The exception basically provides a safe harbor for ordinary changes in the public presentation of VARA-qualifying artworks; the artist has no cause of action unless through gross negligence the work is modified, distorted, or destroyed in the process of changing its public presentation.

Second, *Phillips*'s all-or-nothing approach to site-specific art may be unwarranted. Site-specific art is not *necessarily* destroyed if moved; modified, yes, but not always utterly destroyed. Moreover, some of VARA's protections are unaffected by the public-presentation exception. An artist's right of integrity can be violated in ways that do not implicate the work's location or manner of public presentation; site-specific art—like any other type of art—can be defaced and damaged in ways that do not relate to its public display. And the public-presentation exception does nothing to limit the right of attribution, which prevents an artist's name from being misappropriated.

Then there is the matter of the building exception, which applies to works "incorporated in or made part of a building in such a way that removing the work from

the building will cause the destruction, distortion, mutila-
tion, or other modification of the work." 17 U.S.C.
§ 113(d)(1)(A). These works do not get moral-rights
protection if the artist: (1) consented to the installation
of his work in the building (if pre-VARA); or (2) executed
a written acknowledgment that removal of the work
may subject it to destruction, distortion, mutilation, or
modification (if post-VARA). *Id.* § 113(d)(1)(B). On its
face this exception covers a particular kind of site-
specific art. Its presence in the statute suggests that site-
specific art is not categorically excluded from VARA.[8]

These observations are of course general and not
dispositive. Because we are resolving the VARA claim on
other grounds, we need not decide whether VARA is
inapplicable to site-specific art.

## B.  The Park District's Cross-Appeal on the Contract Claim

The Park District challenges the judgment against it
for breach of contract even though damages were
assessed at a nominal $1. The district court held that
Commissioner Burroughs's casual remark—"You're still

---

[8] The Park District argued that the building exception
applied to Wildflower Works because the garden is located on
top of the Monroe Street parking garage and accommodates
the air vents that provide ventilation to the garage below. This
strikes us as something of a reach. Wildflower Works is not
"incorporated into" or "made part of" the parking garage; it
is situated on top of it.

there, aren't you? That's all you need to do."—created an implied-in-fact contract requiring the Park District to give Kelley reasonable notice before reconfiguring Wildflower Works. Although factual findings about the existence of a contract are reviewed for clear error, *ReMapp Int'l Corp. v. Comfort Keyboard Co.*, 560 F.3d 628, 633 (7th Cir. 2009), there is a threshold legal question here about the commissioner's unilateral authority to bind the Park District to a contract. Our review is de novo. *See Manning v. United States*, 546 F.3d 430, 432 (7th Cir. 2008).

Two statutes guide our analysis. The first is the Chicago Park District Act, which provides in relevant part that "[t]he commissioners of [the Park District] constitute the corporate authorities thereof, and have full power to manage and control all the officers and property of the district, and all parks, driveways, boulevards and parkways maintained by such district or committed to its care and custody." 70 ILL. COMP. STAT. 1505/7.01. The district court noted the statute's use of the plural "commissioners" and "authorities" and concluded from this that each individual commissioner was a separate corporate "authority" with the power to unilaterally bind the Park District.

This conclusion strains the statutory language and ignores how public bodies customarily operate. It also contradicts another provision in the Illinois Park District Code, which applies to all Illinois park districts and must be read in conjunction with the Chicago Park District Act. The Illinois Park District Code states:

> No member of the board of *any* park district . . . shall have power to create any debt, obligation, claim or

> liability, for or on account of said park district . . . *except with the express authority of said board* conferred at a meeting thereof and duly recorded in a record of its proceedings.

70 ILL. COMP. STAT. 1205/4-6 (emphasis added). When read together, these statutes confirm that there is only one corporate authority of the Chicago Park District—its Board of Commissioners—and that individual commissioners cannot unilaterally bind the Park District's Board to a contract without express Board approval.

There is no evidence that the Park District's Board of Commissioners authorized Commissioner Burroughs to enter into a contract with Kelley. Moreover, Illinois law provides that ultra vires contracts entered into by municipal corporations are invalid, *see, e.g., McMahon v. City of Chicago*, 789 N.E.2d 347, 350 (Ill. App. Ct. 2003), so Commissioner Burroughs's offhand remark cannot have created a valid implied-in-fact contract. The judgment for Kelley on the contract claim was premised on legal error; the Park District was entitled to judgment on this claim.

For the foregoing reasons, we AFFIRM the judgment in favor of the Park District on the VARA claim; we REVERSE the judgment in favor of Kelley on the contract claim and REMAND with instructions to enter judgment for the Park District.