**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SIMON CHEFFINS and GREGORY
JONES,
*Plaintiffs-Counter-Defendants-*
*Appellants*,

v.

MICHAEL B. STEWART,
*Defendant-Counter-Plaintiff-*
*Appellee.*

No. 12-16913

D.C. No.
3:09-cv-00130-RAM

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert A. McQuaid, Magistrate Judge, Presiding

Argued and Submitted October 8, 2014
San Francisco, California

Filed June 8, 2016

Before: Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain and M. Margaret McKeown, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge McKeown

# SUMMARY[*]

## Visual Artists Rights Act

The panel affirmed the district court's judgment in favor of the defendant in an action under the Visual Artists Rights Act and Nevada law.

Plaintiffs transformed a used school bus into *La Contessa*, a mobile replica of a 16th-century Spanish galleon for use at the Burning Man Festival. After the defendant took possession of the land on which *La Contessa* was stored, he burned its wooden structure so that a scrap metal dealer could remove the underlying school bus from his property.

Affirming the district court's summary judgment on the VARA claim, the panel held that *La Contessa* was "applied art" and therefore was not covered by VARA's protection of artists' rights of integrity and attribution in works of visual art. Agreeing in large part with the Second Circuit's analysis, the panel held that an object constitutes a piece of applied art—as opposed to a work of visual art—where the object initially served a utilitarian function and the object continues to serve such a function after the artist makes embellishments to it.

The panel held that at trial on the plaintiffs' conversion claim, the district court did not abuse its discretion in excluding expert testimony, nor in instructing the jury on abandoned property, lost profits, and punitive damages. The

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court also did not abuse its discretion in admitting evidence of drug paraphernalia surrounding *La Contessa* as it sat on the defendant's property.

Finally, the panel held that the district court did not err in awarding attorneys' fees to the defendant after the plaintiffs rejected an offer of judgment made under Nevada law.

Concurring, Judge McKeown expressed concern with the majority's definition of applied art. She wrote that the right question to ask is whether the primary purpose of the work as a whole is to serve a practical, useful function, and whether the aesthetic elements are subservient to that utilitarian purpose.

## COUNSEL

Paul E. Quade (argued), Quade Law, Ltd., Reno, Nevada, Plaintiff-Appellants.

Keegan G. Low (argued) and Kristen L. Martini, Robison, Belaustegui, Sharp & Low, Reno, Nevada, for Defendant-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the Visual Artists Rights Act applies to a used school bus transformed into a mobile replica of a 16th-century Spanish galleon.

I

A

Plaintiffs Simon Cheffins and Gregory Jones, along with a number of volunteers, built the *La Contessa*, a replica of a 16th-century Spanish galleon for use at the Burning Man Festival.[1] Cheffins began his creation by acquiring a used school bus. He and Jones then designed and constructed the galleon facade, including a hull, decking, masts, and a hand-crafted figurehead. These elements and the bus were then transported to the Black Rock Desert in northern Nevada, the site of Burning Man, and assembled. When completed, the *La Contessa* was approximately sixty feet wide and sixteen feet long with a mast over fifty feet tall.

The *La Contessa* first appeared at the Festival in 2002. Festival participants took rides on the *La Contessa*, and at least two weddings were performed on its deck. It reappeared in 2003 and 2005. In 2003, it was used as part of a marching band performance, and, in 2005, it was the centerpiece of a children's treasure hunt, among other things.

---

[1] As Cheffins and Jones helpfully explain, Burning Man is an art and countercultural festival held each year for the week preceding Labor Day.

After the 2002 Festival, Cheffins and Jones stored the *La Contessa* on property owned by Festival organizers. After the 2003 and 2005 Festivals, Cheffins and Jones stored the *La Contessa* on land in Nevada held in life estate by one Joan Grant, who had given them permission to do so. In late 2005, however, Grant's home burned down, causing her to abandon the life estate. Thereafter, defendant Michael Stewart took possession of the land in fee simple through a limited liability company.

Cheffins and Jones did not relocate the *La Contessa* after the change of property ownership. Rather, it sat unmoved on Stewart's land until December 2006. Sometime during that month, Stewart intentionally burned the wooden structure of the *La Contessa* so that a scrap metal dealer could remove the underlying school bus from his property.

B

Cheffins and Jones filed this suit in the District of Nevada in March 2009, alleging that Stewart violated the Visual Artists Rights Act, 17 U.S.C. § 106(A) (VARA), and committed common law conversion when he destroyed the *La Contessa*. After cross motions for summary judgment, Magistrate Judge Robert McQuaid dismissed Cheffins and Jones's claim under the VARA, concluding that the *La Contessa* was "applied art" and so not protected by the statute.[2] Cheffins and Jones's conversion claim proceeded to trial before a jury, which found in favor of Stewart, who then moved for and was granted an award of attorneys' fees under

---

[2] The parties consented to proceed before a magistrate judge under 28 U.S.C. § 636(c).

Federal Rule of Civil Procedure 54(d)(2) and Nevada state law.

## II

In this timely filed appeal, Cheffins and Jones contend that the trial court erred when it granted summary judgment on their VARA claim and that Stewart was not entitled to attorneys' fees. Cheffins and Jones also appeal several evidentiary rulings, assert that the trial court gave several deficient jury instructions, and contend that the trial court erred when it failed to grant summary judgment on their conversion claim.

## A

The VARA was enacted in 1990 as an amendment to the Copyright Act. 17 U.S.C. § 106A. "The purpose of VARA is to protect two 'moral rights' of artists—the rights of 'integrity' and 'attribution.'" *Cort v. St. Paul Fire & Marine Ins. Cos.*, 311 F.3d 979, 984–85 (9th Cir. 2002) (citing H.R. Rep. No. 514, 101st Cong., 2nd Sess. 5 (1990)). "The right of integrity allows the [artist] to prevent any deforming or mutilating changes to his work, even after the title in the work has been transferred." *Id.* at 985 (citation omitted and internal quotation marks omitted) (alteration in original). "The right of attribution allows the artist to be recognized by name as the creator of a work." *Id.* In order to provide those protections, the VARA states that "the author of a work of visual art" shall "have the right," among other things, to "prevent any intentional distortion, mutilation, or other modification of [a] work which would be prejudicial to his or her honor" and "to prevent any destruction of a work of

recognized stature, and any intentional or grossly negligent destruction of that work . . . ." 17 U.S.C. § 106A(a).

As the text of the statute shows, the VARA only applies to "works of visual art." It does not define the term "work of visual art," but the VARA is part of the Copyright Act, which defines "work of visual art" in the affirmative and in the negative. A "work of visual art" is:

> (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or
>
> (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

17 U.S.C. § 101. On the other hand, a "work of visual art" is not:

> (A)(i) any poster, map, globe, chart, technical drawing, diagram, model, *applied art*, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base,

electronic information service, electronic publication, or similar publication;

(ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;

(iii) any portion or part of any item described in clause (i) or (ii).

*Id*. (emphasis added).

B

On summary judgment, Stewart asserted, and the trial court subsequently concluded, that the *La Contessa* was not a "work of visual art" because it was "applied art." Whether the trial court properly granted summary judgment on the VARA claim turns on whether the *La Contessa* was a "work of visual art." The parties assert that this question, in turn, depends on whether it was applied art.[3]

---

[3] Even if the *La Contessa* were not "applied art" it is not clear that it would qualify for protection under the VARA. After all, the "VARA's definition of work of visual art operates to narrow and focus the statute's coverage; only a painting, drawing, print, or sculpture, or an exhibition photograph will qualify." *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 300 (7th Cir. 2011) (internal quotation marks omitted). While the trial court concluded that the *La Contessa* was a sculpture, we need not further address the issue because it is not raised on appeal.

III

A

The VARA does not define the term "applied art," and federal courts have rarely had occasion to interpret its meaning. In *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995), the Second Circuit held that a sculpture constructed of portions of a school bus and affixed to a wall in a building lobby was not "applied art." *Id*. at 83. It explained that the term "applied art" means "two-and three-dimensional ornamentation or decoration that is affixed to otherwise utilitarian objects." *Id*. at 84–85 (internal quotation marks omitted). The court further explained that the sculpture was not "applied art" simply because it was affixed to "the lobby's floor, walls, and ceiling" because "[i]nterpreting applied art to include such works would render meaningless VARA's protection for works of visual art installed in buildings." *Id.* at 85.

The Second Circuit provided an additional gloss on what constitutes a "work of visual art," and by extension what constitutes "applied art," in *Pollara v. Seymour*, where it explained that the "VARA may protect a sculpture that looks like a piece of furniture, but it does not protect a piece of utilitarian furniture, whether or not it could arguably be called a sculpture." 344 F.3d 265, 269 (2d Cir. 2003). The court went on to hold that an elaborate painted banner was not a "work of visual art" eligible for protection under the VARA. *Id*. at 271.

We agree in large part with the Second Circuit's analysis. As the Second Circuit suggested, the focus of our inquiry should be on whether the object in question originally

was—and continues to be—utilitarian in nature. Such a focus comports with dictionary definitions of the term "applied art."[4] For example, *Webster's Dictionary* defines "applied art" as "employed in the decoration, design or execution of *useful* objects." The Merriam Webster Dictionary 105 (3d ed. 1974) (emphasis added). Similarly, the *Oxford English Dictionary* explains that one definition of "applied" is "put to practical use" and lists "applied arts" as a frequent application of the term. The Oxford English Dictionary (2d ed. 1989). These definitions suggest that, in its ordinary meaning, applied art consists of an object with a utilitarian function that also has some artistic or aesthetic merit.

Further, this approach makes sense in the statutory context in which "applied art" is used in 17 U.S.C. § 101. "Applied art" is enumerated in a list that also contains, *inter alia*, maps, globes, charts, technical drawings, diagrams, models, newspapers, periodicals, data bases, and electronic information services. 17 U.S.C. § 101. The fact that the other items in the list are utilitarian objects leads us to conclude that the listed items are related by their practical purposes and utilitarian functions, requiring a focus on utility when construing the term "applied art."[5]

---

[4] We adopt the "common practice of consulting dictionary definitions" to clarify the "ordinary meaning" of terms used in a statute but not defined therein. *Johnson v. Aljian*, 490 F.3d 778, 780 (9th Cir. 2007). We consult "the edition [of the dictionary] in print when Congress enacted" the VARA. *Id*.

[5] Under the canon of *noscitur a sociis* "statutory terms 'grouped in a list should be given related meaning'" and the fact that "'several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.'" *Rosebrock v. Mathis*, 745 F.3d 963, 976 (9th Cir. 2014) (quoting *United States v. Kimsey*, 668 F.3d 691, 701 (9th

We therefore hold that an object constitutes a piece of "applied art"—as opposed to a "work of visual art"—where the object initially served a utilitarian function and the object continues to serve such a function after the artist made embellishments or alterations to it.[6]  This test embraces the circumstances both where a functional object incorporates a decorative design in its initial formulation, and where a functional object is decorated after manufacture but continues to serve a practical purpose.  Conversely, "applied art" would not include a piece of art whose function is purely aesthetic or a utilitarian object which is so transformed through the addition of artistic elements that its utilitarian functions cease.

### B

We respond briefly to the concern expressed in the concurrence that the standard we adopt today may not be workable—that it raises difficult questions regarding where exactly the line defining "applied art" will be drawn.  *See* Concurrence at 22.  The analysis we adopt today directs the court's attention away from assessments of an object's artistic merit and instead toward the object's practical utility.  The standard is relatively simple: where a functional object, despite claims of artistic merit, continues to serve a utilitarian

---

Cir. 2012)); *see also* Antonin Scalia and Bryan Garner, Reading Law: The Interpretation of Legal Texts 195–98 (2012) (discussing the *noscitur a sociis* canon).

[6] With recognition that nearly every object on which art is installed will be in some sense "utilitarian," we caution that the utilitarian function must be something other than mere display of the work in question. *See also* 17 U.S.C. § 101 ("A 'useful article' is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information.").

purpose, it is applied art. Although the answers to some of the questions regarding this standard may be clear,[7] resolution of the case before us does not require us to provide a comprehensive inventory of all the objects that will or will not meet the definition of "applied art."

Indeed, the call for a "more textured and flexible definition of applied art," Concurrence at 22, raises even greater concerns of line drawing. The concurrence would have judges "evaluate [a] work as a whole," to determine "whether the artistic creation is subservient" to its "useful function." *Id.* at 28. Such an analysis necessarily requires courts to express judgments regarding the importance of an object's artistic qualities, and to determine whether those qualities predominate over the object's non-artistic utility. Even approached from the perspective of a "reasonable observer," *id.* at 29, the question for a court remains whether an objectively reasonable person would conclude that a creation is more "art" than useful object. How different judges could answer such a question on a consistent basis is anything but clear.

Any attempt to guide judicial determinations of an amorphous concept like "applied art" is unlikely to be completely satisfying to all. But the approach we adopt today

---

[7] For example, we have explained that the "transformation from utilitarian object to work of art," Concurrence at 22, occurs where an object's *utilitarian functions cease*. We can leave for another case whether there might be some de minimis exception to this standard, where an object continues to serve only the most trivial of utilitarian functions. Further, we have explained that our focus is on objects that *in fact* continue to serve real utilitarian functions (as opposed to those which may retain the ability to serve utilitarian functions, or those which at one point in history served such functions, *see id.*).

instructs courts to focus precisely on an object's continuing utility—and not to ask whether that utility is somehow subservient to an artistic creation. Difficult cases may still arise, but our standard aims to limit the situations in which they do.

C

We now apply this standard to the facts of this case.

The *La Contessa* began as a simple school bus—an object which unquestionably served the utilitarian function of transportation. To transform the bus into the *La Contessa*, Cheffins and Jones adorned it with the visual trappings of a 16th-century Spanish galleon. While the *La Contessa*'s elaborate decorative elements may have had many artistic qualities, the *La Contessa* retained a largely practical function even after it had been completed. At Burning Man, the *La Contessa* was used for transportation, providing rides to festival-goers, hosting musical performances and weddings, and serving as a stage for poetry and acrobatics shows. Indeed, the *La Contessa* often was driven about the Festival grounds and was banned from the Festival in 2004 because "its unsafe driving practices far exceeded community tolerance and out-weighed the visual contribution" it made.

Under the definition we adopt today, the *La Contessa* plainly was "applied art." It began as a rudimentary utilitarian object, and despite being visually transformed through elaborate artistry, it continued to serve a significant utilitarian function upon its completion. As "applied art," the *La Contessa* was not a work of visual art under the VARA and therefore not eligible for its protection. Therefore, the trial

court properly granted summary judgment to Stewart on Cheffins and Jones's VARA claim.

## IV

### A

Cheffins and Jones next argue that the trial court abused its discretion when it excluded the testimony of Joanne Northrup and Diedre DeFranceaux, two of their expert witnesses, and when it refused to allow Cheffins and Jones to supplement other expert reports. After conducting a lengthy hearing on the matter, the trial court concluded that the proffered testimony would be unduly speculative. The trial court did not abuse its considerable discretion in this case. We have repeatedly explained that "a trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (internal quotation marks omitted).

### B

Cheffins and Jones raise two issues related to the trial court's jury instructions on abandoned property. First, they contend that the trial court abused its discretion when it declined to instruct the jury on abandoned property, lost profits, and punitive damages based on Nevada Revised Statues §§ 487.210–487.250. The trial court did not abuse its discretion. The statutory scheme only applies to "vehicles abandoned on public land," and it is uncontested that the *La*

*Contessa* remained on Stewart's private land until its destruction. N.R.S. § 487.235.**[8]**

Second, Cheffins and Jones contend that the trial court improperly instructed the jury on abandonment under Nevada law, asserting that the given instruction failed to explain the required showing of intent. The given instruction, however, explained that "abandonment may be inferred from . . . acts done" and thus comported with Nevada law. *See J.H. Mallett v. Uncle Sam Gold & Silver Mining Co.*, 1 Nev. 188, 204–05 (1865) (holding that "the moment the intention to abandon and the relinquishment of possession unite, the abandonment is complete").

### C

Cheffins and Jones next assert that the trial court abused its discretion by failing to include jury instructions on lost profits and punitive damages resulting from the destruction of the *La Contessa*—which the court concluded were unduly speculative. The court did not abuse its discretion. Moreover, even if the district court had erred, such error was harmless because the jury found in favor of Stewart on Cheffins and Jones's conversion claim, meaning that there were no damages to award in any case. *See Kennedy v. S. Cal. Edison Co.*, 268 F.3d 763, 770 (9th Cir. 2001) (explaining that "[h]armless error review applies to jury instructions in civil cases").

---

**[8]** Cheffins and Jones's related contention that the trial court should have provided a jury instruction based on N.R.S. § 118A.460 fails for a similar reason. That statute applies to landlord-tenant relationships, and is inapplicable to the facts of this case.

D

Cheffins and Jones also contend that the trial court erred when it admitted evidence of drug paraphenalia surrounding the *La Contessa* as it sat on Stewart's property. The trial court first determined that it would not admit such evidence, but then reversed itself and allowed the evidence "simply to show the condition of things around the ship" when a witness visited the *La Contessa*. We have previously explained that "evidentiary rulings should not be reversed absent clear abuse of discretion and some prejudice," *S.E.C. v. Jasper*, 678 F.3d 1116, 1122 (9th Cir. 2012), and we see neither clear abuse of discretion nor prejudice here. Such evidence was relevant to the value of the *La Contessa* at the time of its destruction, and the trial court provided the jury with an appropriate limiting instruction.

E

Cheffins and Jones next contend that the trial court erred when it denied their motion for partial summary judgment on their conversion claim. The conversion claim subsequently was presented to a jury, which returned a verdict in favor of Stewart. Cheffins and Jones's appeal therefore fails at the outset, because "we do not review the denial of summary judgment when the case has gone to trial." *Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1193 (9th Cir. 2006); *see also Lum v. City & Cty. of Honolulu*, 963 F.2d 1167, 1170 (9th Cir. 1992) (concluding that "there is no need to review denials of summary judgment after there has been a trial on the merits," and dismissing appeal).

V

Finally, Cheffins and Jones challenge the court's award of attorneys' fees to Stewart, which the court made after they rejected an offer of judgment made under Nevada law. Federal Rule of Civil Procedure 54(d) allows a party to recover attorneys' fees, when, among other things, a motion specifies "the statute, rule, or other grounds entitling the movant to the award." Moreover, we have recognized that, under Nevada law, "a prevailing [party] is entitled to recover attorneys' fees if an offer of judgment is rejected." *MRO Commc'ns, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th Cir. 1999); *see* Nev. R. Civ. P. 68.

Cheffins and Jones assert that the timing requirements of Federal Rule of Civil Procedure 68 apply to an offer of judgment made under state law, rendering the award of attorneys' fees improper because the offer of judgment on which the trial court based its award would not have been timely. Stewart urges that Rule 68 does not apply.

We agree with Stewart. "Rule 54 provides a federal procedural mechanism for moving for attorney's fees that are due under state law." *Med. Protective Co.v. Pang*, 740 F.3d 1279, 1283 (9th Cir. 2013). Therefore, "Nevada's offer of judgment rules and statutes . . . provide the applicable procedure" for awarding attorneys' fees in a case like this one, where the only claim at the time Stewart made his offer of judgment was a state law conversion claim. *MRO*, 197 F.3d at 1281–83 ("In an action where a district court is exercising its subject matter jurisdiction over a state law claim" the "state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." (quoting *Alyeska Pipeline*

*Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 n.31 (1975))).  Because Federal Rule of Civil Procedure 54(d)(2) provides the applicable procedure for awarding attorneys' fees, and because Stewart's offer of judgment complied with the underlying Nevada state law rule, it was timely for purposes of the trial court's award of attorneys' fees.[9]

**AFFIRMED.**[10]

McKEOWN, Circuit Judge, concurring:

I write separately to express my concern with the majority's definition of applied art, which centers on whether an object has or retains a utilitarian function.  Maj. Op. 10. This focus runs the risk of unduly narrowing the protections of artists under the Visual Artist Right's Act of 1990, 17 U.S.C. § 106A ("VARA"), and not focusing on the work as a whole.  Although the majority's formulation may protect the clearest cases—those works that are "purely aesthetic" or "so transformed through the addition of artistic elements that [their] utilitarian functions cease," Maj. Op. 11,—it leaves

---

[9] While the parties did not brief the issue, we agree with the trial court that there is no conflict between Federal Rule of Civil Procedure 68 and Nevada Rule of Civil Procedure 68. *See Goldberg v. Pac. Indem. Co.*, 62 F.3d 752, 756 n.7 (9th Cir. 2010) (explaining that the *MRO* opinion is not relevant to whether Arizona's offer of judgment rule conflicts with Federal Rule of Civil Procedure 68 because, unlike Arizona, Nevada's rule allows for recovery of attorneys' fees).

[10] The denial of Cheffins and Jones's motion for summary judgment is not appealable and their appeal from that order is therefore **DISMISSED**. *Affordable Hous. Dev. Corp.*, 433 F.3d at 1193.

other cases—such as works of art that incorporate utilitarian elements, or that could be put to practical purposes—out in the cold. To better effectuate the purpose of VARA, we need a more nuanced definition of "applied art" that balances between the risk of unduly restricting VARA's reach and the risks of turning judges into art critics or consigning to litigation every work of art that includes some utilitarian function. In determining whether a work is "applied art," the right question to ask is whether the primary purpose of the work as a whole is to serve a practical, useful function, and whether the aesthetic elements are subservient to that utilitarian purpose. Because the bus/Spanish galleon *La Contessa* is applied art under either standard, I concur in the judgment as well as parts I, II, IV, and V of the panel opinion.

VARA enshrined the concept of *droit moral*, or "moral rights," in American law to a limited extent. Cheryl Swack, *Safeguarding Artistic Creation and the Cultural Heritage: A Comparison of* Droit Moral *Between France and the United States*, 22 Colum.-VLA J.L. & Arts 361, 363 (1998). Long recognized in Europe, moral rights "afford protection for the author's personal, non-economic interests in receiving attribution for her work, and in preserving the work in the form in which it was created, even after its sale or licensing." Jane C. Ginsburg, *Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990*, 14 Colum.-VLA J.L. & Arts 477, 478 (1990).

VARA protects the moral rights of attribution and integrity, but only for a narrow subset of the works of visual art already protected under the Copyright Act. 3 Nimmer on Copyright § 8D.06[A][2]. Thus, the creator of a qualifying "painting, drawing, print, or sculpture," or "still photographic

image produced for exhibition purposes only," 17 U.S.C.
§ 101, may "prevent any intentional distortion, mutilation, or
other modification of [the] work which would be prejudicial
to his or her honor" and to "claim authorship" of the work.
*Id.* § 106A(a). Coverage is limited to these listed
categories of works of visual art. The statute also prohibits
the destruction of work of "recognized stature." *Id.*
§ 106A(a)(3)(B). As a result, acts of so-called "art murder"
like the removal of Diego Rivera's mural from Rockefeller
Center, now have limits.[1] Thus, when Kent Twitchell's mural
depicting artist Ed Rucha was painted over, Twitchell sued
under VARA; he ultimately settled for $ 1.1 million.[2]

The protections provided by VARA "are analogous to
those protected by Article 6*bis* of the Berne Convention."
H.R. Rep. No. 101-514, at 5 (1990).[3] Affording artists these

---

[1] In 1934, Rivera's unfinished mural was removed from the wall of the
RCA building and destroyed over the course of a weekend. The
Rockefellers apparently made this decision due to Rivera's refusal to omit
the figure of Lenin from his work. *See Rivera RCA Mural is Cut from
Wall*, N.Y. Times, February 13, 1934, at 21. Indeed, the mutilation of a
Picasso painting, *Trois Femmes*, by two Australian "entrepreneurs" was
significant to the passage of VARA. *See* H.R. Rep. No. 101-514, at 17.

[2] Although Twitchell's generous settlement was heralded as "a
vindication of artists' moral rights under VARA, the case provides no
judicial precedent on this matter." Charles Cronin, *Dead on the Vine:
Living and Conceptual Art and VARA*, 12 Vanderbilt J. Ent. & Tech. L.
209, 219 n.49 (2010).

[3] The Berne Convention secures "the protection of the rights of authors
in their literary and artistic works," Berne Convention for the Protection
of Literary and Artist Works, art. 1, July 24, 1971, S. Treaty Doc. No. 99-
27 (1986), including moral rights "[t]o claim authorship" and "to object
to certain modifications and other derogatory actions," *id.* at art. 6*bis*. The
United States acceded to the Berne Convention in 1988, but did not

rights—which are otherwise largely not recognized in our intellectual property system—helps foster a "climate of artistic worth and honor that encourages the author in the arduous act of creation." *Id.* (internal quotations omitted); *see also Kelley v. Chicago Park Dist.*, 635 F.3d 290, 296–98 (7th Cir. 2011) (detailing the history of VARA).

Although VARA amended the Copyright Act, its unique protections do not extend to every copyrightable work. Rather, the statute may be invoked only if the painting, drawing, print, sculpture, or "still photographic image produced for exhibition purposes only" is part of a "limited edition of 200 copies or fewer" that have been "signed and consecutively numbered by the author." 17 U.S.C. § 101. Significantly, a work does not fall within VARA's protection if, among other exclusions, it is mass-produced, intended for use in advertising, or is "applied art." *Id.*

This case hinges on that final exception—applied art. The parties agree that *La Contessa*, a Spanish galleon built on the chassis of a school bus by Cheffins and Jones, was a sculpture. The parties also do not contest that *La Contessa* was a work of recognized stature. Thus VARA would prohibit the destruction of *La Contessa* unless it was a work of applied art.

The majority focuses the inquiry "on whether the object in question originally was—and continues to be—utilitarian in nature." Maj. Op. 9–10. Thus, the majority holds "that an object constitutes a piece of 'applied art'—as opposed to a 'work of visual art'—where the object initially served a

recognize moral rights until Congress enacted VARA two years later. Swack, *supra* at 363.

utilitarian function and the object continues to serve such a utilitarian function after the artist made embellishments or alterations to it." Maj. Op. 11. This definition pays insufficient heed to the character of the work as a whole and fails to clarify when the product of artistic creation has crossed the threshold of functionality that transforms it from visual to applied art.

The central focus of our inquiry should be on whether a work is primarily directed to a utilitarian purpose. The majority's bare statement provides scant guidance. At what point does the transformation from utilitarian object to work of art occur? Is any residual utilitarian function sufficient to consign a work to the "applied art" label, or must the utilitarian function be significant? Does it matter whether an object within a work retains a possible, but unused or impractical, utilitarian function versus whether it continues to be used for its original purpose? What is the magic dividing line that informs our legal determination? These questions highlight the need for a more textured and flexible definition of applied art.

Defining the term "applied art" is no easy task. To be sure, judicial attempts to categorize artistic creations are fraught with difficulties. As Justice Holmes observed long ago, judges make terrible art critics: "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations." *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903). There is some irony in the fact that VARA was enacted as part of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, which created eighty-five new federal district and appellate judgeships. Thankfully, apart from occasional fair use cases under the Copyright Act, these

judges have been able to devote themselves to tasks other than critiquing paintings and sculptures. Although VARA does not ask us to assess the beauty or value of art, attempting to discern whether a unique creation is visual or utilitarian art poses similar challenges.

The difficulty of our job is compounded because VARA provides no definition of applied art. Leaders of the art community warned Congress that VARA "does not offer firm definitions" of applied and visual art, leaving "open for conjecture the kinds of art and artists eligible for protection." *Hearing on H.R. 3221, Visual Artists Rights Act of 1987, Before the Subcomm. on Courts, Civil Liberties and the Admin. of Justice of the H. Comm. on the Judiciary*, 100th Cong. 136 (1988) (testimony of the Association of Art Museum Directors, American Arts Alliance, and American Association of Museums). Congress was unmoved: the House Report accompanying the bill unhelpfully states that the definition of applied art is "self-explanatory" and instructs courts construing the statute to use "common sense" as well as the "generally accepted standards of the artistic community." H.R. Rep. No. 101-514, at 11, 13.

Although many court decisions have addressed applied art, these cases provide little guidance on how to distinguish applied from visual art. The issue in nearly all applied art cases is whether the work was copyrightable applied art or instead a noncopyrightable work of "industrial design." *See, e.g.*, *Gay Toys, Inc. v. Buddy L Corp.*, 703 F.2d 970, 972 (6th Cir. 1983) ("Congress intended to distinguish between 'copyrightable works of applied art and uncopyrighted works of industrial design.'" (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 54)); *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918, 920 (11th Cir. 1983) ("[There is a]

distinction between works of applied art eligible for copyright protection and industrial designs ineligible for protection."); *Eltra Corp. v. Ringer*, 579 F.2d 294, 297 (4th Cir. 1978) (noting the "precise line between copyrightable works of applied art and uncopyrighted works of industrial design").

The analysis in these cases is driven by the principle that works may unquestionably be applied art, such as a detailed carving on the back of a chair—an obviously utilitarian object—but may also enjoy certain copyright protection.[4] Whether such a work falls under VARA's protections is a different question. Thus, while these opinions have coalesced around a definition of applied art for the purpose of copyright protection as "pictorial, graphic, and sculptural works that are intended to be or have been embodied in useful articles," 8-4A Nimmer on Copyright § 102, they do not provide an answer under VARA because VARA protects a new and different "genus" of "'works of visual art,'" 3 Nimmer on Copyright § 8D.06[A][2].

VARA's protections cannot be limited only to works entirely devoid of any utilitarian purpose. As Judge Gesell once noted: "Art through the ages has often served a utilitarian purpose[]." *Esquire, Inc. v. Ringer*, 414 F. Supp. 939, 941 (D.D.C. 1976), *rev'd* 591 F.2d 796 (D.C. Cir. 1978). Many outstanding sculptures, including the Caryatids of the Acropolis and the monumental carvings of Ramses at the temple of Karnak are in fact columns that provided buildings with structural integrity. Medieval tapestries not only

---

[4] Indeed, examples of original "pictoral, graphic, and sculptural works" protected by copyright include dolls and toys, mosaics, and stained glass designs. United States Copyright Office, Circular 40.0915, *Copyright Registration for Pictorial, Graphic, and Sculptural Works* (2015).

represented a form of fine art, but also "ke[pt] castles and cathedrals free from draft."  William S. Lieberman, *Modern French Tapestries*, 6 Metropolitan Museum of Art Bulletin 142, 142 (1948).  Of course, the famous Bayeux tapestries, which depict events leading to the Battle of Hastings, retain their utilitarian function to some extent: they could still be used to keep a drafty castle warm.  Likewise, Tracy Emin's *My Bed*, displayed at the Tate Britain, incorporates Emin's real bed as a "monument to the heartache of a relationship breakdown."[5]  The bed arguably retains its original utilitarian function—it remains a bed, and could still be slept in—but it is no longer meant or used for this utilitarian purpose.  Rather, like the Bayeux tapestries, *My Bed* is now appreciated and viewed as a work of creative expression and, when viewed as a whole, the utilitarian object has become part of a visual art piece.

The modern era abounds with examples of fine art that serve some utility.  Perhaps the most famous sculpture of the modern era—Rodin's *The Thinker*—was conceived when the artist was designing a set of monumental doors titled *The Gates of Hell*.[6]  Doors, of course, are utilitarian objects that facilitate the movement of people into and out of buildings.  Likewise, a young Pablo Picasso painted a massive background piece for the ballet *Le Tricorne*.  Although that painting surely served some utilitarian purpose as a stage

---

[5] Hannah Ellis-Petersen, *Tracy Emin's Messy Bed Goes on Display at Tate for First Time in 15 Years*, The Guardian (Mar. 30, 2015, 10:41 AM), http://www.theguardian.com/uk-news/2015/mar/30/tracey-emins-messy-bed-displayed-tate-britain-first-time-in-15-years.

[6] Rodin envisioned Dante sitting and contemplating the scenes of eternal damnation portrayed on the *Gates*.  Albert E. Elsen, *Rodin's* Thinker *and the Dilemmas of Modern Public Sculpture* 43 (1985).

curtain, following that debut, it has been displayed as a painting for half a century. The painting was the focus of intense debate when it was removed last year from the Four Seasons restaurant in New York's Seagram Building, where it had hung since 1959.[7] Some sculptures designed by Dale Chihuly are fantastically artistic and original and yet could also serve a utilitarian purpose of diffusing fresh water or serving as a room divider. The artistic and utilitarian aspects are entwined in some of Chihuly's pieces.[8]

It is easy to imagine a sculpture composed of an array of utilitarian objects. VARA's legislative history confirms this situation: Congress emphasized that because "[a]rtists may work in a variety of media, and use any number of materials in creating their works . . . . whether a particular work falls within the definition should not depend on the medium or materials used." H.R. Rep. No. 101-514, at 11. Indeed, a Florida plumber/artist who created a sculpture with auto parts, plumbing fixtures and scrap wiring, found himself in the middle of VARA litigation when the "junk" was removed.[9] Automatically relegating these pieces—which are

---

[7] *Le Tricorne* has found a new home at the New York Historical Society. Benjamin Muller, *After 55 Years in Vaunted Spot, a Picasso Is Persuaded to Curl*, N.Y. Times, Sept. 7, 2014, at A14.

[8] Chihuly's work is heralded for "render[ing] meaningless the distinctions between utilitarian product and art, art and craft, beauty and function." Patterson Sims, *Suola di Chihuly: Venezia and Seattle, in Dale Chihuly: Installations 1964–1992* (1992).

[9] The story of this fascinating dispute is outlined in Christopher J. Robinson's note: *The "Recognized Stature" Standard in the Visual Artists Rights Act*, 68 Fordham L. Rev. 1935, 1958 (2000). The parties did not contest that the work was a sculpture, but fought bitterly over whether the visual art was of "recognized stature." *Id.*

unquestionably works of visual art—beyond the scope of VARA simply because they may serve some practical function would undermine the purpose of the law.

The majority alludes to the fact that a work would not necessarily fall outside VARA's scope simply because it could possibly serve some practical purpose, concluding that *La Contessa* must be "applied art" because "it continued to serve a significant utilitarian function upon its completion." Maj. Op. 13. But how significant the utilitarian function must be—either when a work is initially created, or after it undergoes artistic modifications—cannot be deduced from the majority's test for "applied art." The analysis must be more nuanced, and, as a matter of procedure, in some cases, these issues will raise questions of fact that preclude summary judgment.

Art dictionaries and reference materials provide useful guidance on this score. In seeking to distinguish applied art from "fine art," *The Concise Oxford Dictionary of Art Terms* states that applied art is "Art that is created for useful objects *and remains subservient to* the functions of those objects." *The Concise Oxford Dictionary of Art Terms* 13 (Michael Clarke and Deborah Clarke eds., 2d ed. 2010) (emphasis added). As examples, it lists "ceramics, furniture, glass, leather, metalwork, textiles, arms and armour, clocks, and jewelry." *Id.* Likewise, *The Thames & Hudson Dictionary of Art Terms* confirms that applied art is "Art which is *essentially* functional, but which is also designed to be aesthetically pleasing." *The Thames & Hudson Dictionary of Art Terms* 17 (Edward Lucie-Smith ed., 2d ed. 2004) (emphasis added). This dictionary provides a similar list of applied art items: "furniture, metalwork, clocks, textiles, [and] typography." *Id.* The definition of applied art in

materials published by the World Intellectual Property Organization ("WIPO")—the body tasked with administering the Berne Convention—is also helpful. WIPO has defined applied art as "cover[ing] the artistic contributions of the makers of knick-knacks, jewellery, gold and silverware, furniture, wallpaper, ornaments, clothing, etc." WIPO, *Guide to the Berne Convention for the Protection of Literary and Artistic Works* 16–17 (1978).[10]

These definitions illustrate that applied art does not encompass every work that has any conceivable utilitarian purpose, nor one that incorporates functional objects or pieces. Rather, the definitions employed by art dictionaries and the objects they list reflect that the key question is whether the primary purpose or essence of the work is utilitarian or functional.

To effect the purpose of VARA and provide guidance for the art community, I believe courts should evaluate the work as a whole, asking whether its primary purpose is to serve a useful function and whether the artistic creation is subservient to that purpose. If the primary purpose is for the work to be viewed and perceived as art, then any incidental utilitarian function will not push it outside the scope of VARA. If a work's primary purpose is functional, however, no amount of aesthetic appeal will transfer it into visual art subject to VARA's protections. Determining a work's primary purpose need not constitute a judicial inquiry into the nature of art. Rather, as in other legal contexts, courts should ask whether

---

[10] This document is available on-line at ftp://ftp.wipo.int/pub/library/ebooks/historical-ipbooks/ GuideToTheBerneConventionForTheProtectionOfLiteraryAndArtistic WorksParisAct1971.pdf

"a reasonable observer" would "consider [the work] designed to a practical degree" for a utilitarian or artistic purpose. *See Lozman v. City of Riviera Beach*, 133 S. Ct. 735, 741 (2013) (articulating a "primary purpose" test for determining whether an object is a "vessel").

In this case, applying the analysis I outline yields the same result as the majority: *La Contessa* was applied art. The school bus-turned-galleon was designed for, and employed as, a performance venue, restaurant, and means of transportation around the Burning Man festival. Poets, acrobats, and bands performed on its decks. It drove revelers from party to party within Nevada's Black Rock desert. On various occasions, the galleon was driven at high speeds, prompting festival organizers to send Cheffins and Jones a letter condemning its "unsafe driving practices." When *La Contessa* was not serving this purpose, it was dragged to a field, covered with a tarp, and left to sit idle for months at a time. Taken as a whole, this is powerful evidence that the primary purpose of *La Contessa* was to serve the utilitarian functions of performance venue, gathering space, and people-mover. Although Cheffins and Jones testified passionately about *La Contessa*'s beauty and the artistic expression they felt it embodied—and it is an impressive work of art in many respects—I conclude it is applied art because its aesthetic appeal was subservient to its primary utilitarian purpose. Thus, the VARA claim fails.

VARA has spawned comparatively little litigation over the last quarter-century, and I hope that no spasm of artistic destruction or mutilation changes this trend. However, given the unique protections under VARA and the inherent difficulties in defining "visual arts" and "applied arts," the arts, the art world, and the legal community would benefit

from a more nuanced and flexible test for determining the scope of VARA's protection of artistic works.